Filed 8/19/24  In re P.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E083083 |
| Plaintiff and Respondent, | (Super. Ct. No. DPRI2200189) |
| v. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** [NO CHANGE IN JUDGMENT] |
| R.C. et al., | |
| Defendants and Appellants. | |
| In re P.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082503 |
| Plaintiff and Respondent, | |
| v. | |
| R.C., | |
| Defendant and Appellant. | |

1

The petition for rehearing is denied.  The opinion filed in this matter on July 30, 2024, is modified as follows:

On page 30, section D. the following shall be added after the last sentence of the paragraph:  Although our decision restores Mother's parental rights, we reiterate that we find no error in the court's order denying Mother's section 388 petition to modify the court's prior dispositional order as to her.  This opinion thus does not require the juvenile court to revisit any of those orders.

The disposition is modified to read as follows:  The juvenile court's orders terminating parental rights is vacation.  The court's order denying Father's section 388 petitions are reversed, and the matter is remanded for a new jurisdiction and disposition hearing involving Father only.

Except for these modifications, the opinion remains unchanged.  This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

MILLER

J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E083083 |
| Plaintiff and Respondent, | (Super. Ct. No. DPRI2200189) |
| v. | OPINION |
| R.C. et al., | |
| Defendants and Appellants. | |
| In re P.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Plaintiff and Respondent, | E082503 |
| v. | |
| R.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge. Affirmed in part, reversed in part with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant, B.M.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant, R.C.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

P.C. and her mother, B.M. (Mother), tested positive for controlled substances when P.C. was born in December 2022.  Within days, the Riverside County Department of Social Services (the Department) filed a petition on P.C.'s behalf under Welfare and Institutions Code section[1] 300, subdivisions (b)(1) and (g), which alleged, among other things, that Father's whereabouts were unknown and thus he could not care for P.C.  P.C. was ordered detained from both parents the following day.  In the following months, the juvenile court sustained the Department's petition, bypassed reunification services for both parents (see § 361.5, subd. (b)), found that the Department had "exercised due

---

[1] Unless otherwise noted, all further statutory references are to Welfare and Institutions Code.

2

diligence in attempting to find" Father, and eventually set the matter for a section 366.26 hearing.

In late July 2023, Father filed a section 388 petition seeking a new jurisdictional hearing, which the juvenile court denied. Father then filed a second section 388 petition in November 2023 requesting reunification services and relative placement. Around the same time, Mother filed a section 388 petition requesting reunification services. The juvenile court summarily denied both petitions, and the case proceeded to a section 366.26 hearing in January 2024 where the juvenile court terminated the parents' parental rights to P.C. The parents timely appealed.

We reverse in part and affirm in part. We conclude the juvenile court properly denied Mother's section 388 petition, but we conclude the juvenile court improperly denied Father's section 388 petitions. The juvenile court erroneously denied Father's first petition, which challenged jurisdiction, based on an unsupported finding that the Department satisfied its duty to locate and notice Father of the dependency proceedings. That error was prejudicial because had the Department located Father sooner, then it is reasonably probable that the juvenile court would have considered placing P.C. with the paternal aunt early on in the case and ultimately may have placed P.C. with her.

The juvenile court erroneously denied Father's second section 388 petition for a related reason. That petition sought placement of P.C. with Father's sister (the paternal aunt), who expressed interest in caring for P.C. in July 2023 and whose home was referred for placement assessment in August 2023. "[T]he Legislature has articulated a

clear preference for relative placement in dependency cases," (*In re Mia M.* (2022) 75 Cal.App.5th 792, 813), yet nothing in the record shows that the juvenile court considered whether P.C. should be placed with the paternal aunt, whose home was still being assessed for placement as of the section 366.26 hearing in January 2024—more than six months after she expressed interest in caring for P.C. We cannot determine from the record why the Department did not timely assess the paternal aunt's home for potential placement of P.C., nor can we determine whether the juvenile court's ever properly considered placing P.C. there. At a minimum, the juvenile court should have held an evidentiary hearing on Father's second section 388 petition to explore placement of P.C. with the paternal aunt. On this record, the juvenile court's failure to do so was prejudicial.

We therefore affirm the juvenile court's order denying Mother's section 388 petition, reverse the orders denying Father's section 388 petitions, vacate the order terminating parental rights under section 366.26, and remand for further proceedings.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Mother gave birth to twin girls (P.C.'s sisters) in San Diego County in January 2021. Because of Mother's drug use and homelessness, the twins were detained from Mother and their alleged father, R.S. The San Diego juvenile court sustained a section 300 petition filed on the twins' behalf and ordered reunification services for Mother and R.S. In December 2021, the San Diego juvenile court held a hearing to address whether

Father (not R.S.) is the twins' father. In March 2022, the court found that Father is their biological father, but terminated his parental rights to them in August 2022.

Mother, who was homeless at the time, gave birth to P.C. in December 2022. Mother tested positive for methamphetamine and admitted to recently using methamphetamine and heroin, which she had used since she was 15 (about 18 years). Mother reported that Father was in "federal prison in San Diego due to drug trafficking charges," but did not know the name of the prison. She also reported that Father "previously used drugs" and had "used methamphetamine and methadone with her."

In a probable cause statement, a Department social worker stated: "the mother reported the father is currently in state prison in San Diego County; however, when I searched for the father, I only discovered one match. The matched name included a middle name without a date of birth. I was unable to confirm with the mother the father's full name or get any additional information. In addition, during my review of the documentation from San Diego County Child Protective Services, it appears that the father had been arrested during that dependency but there was no mention[] as to the reason and what happened to him." Later in the statement, however, the social worker stated that Mother reported "the father is in federal prison in San Diego due to drug trafficking charges," but Mother "was unable to provide me the name of the prison."

In a detention report filed on the same day, the Department social worker stated "[t]here were no discoveries made" concerning Father on the "Riverside County Superior website." The social worker emailed Father's known email address and called him at his

5

last known phone number, but it was no longer in service. The social worker also spoke with the maternal grandmother (MGM) about Father, but she had no information about him or his whereabouts.

On December 6, 2022, the Department filed a petition on P.C.'s behalf under section 300, subdivision (b)(1) and (g). The (b) allegations state Mother and Father have a history of using controlled substances, Mother suffers from mental health issues and is homeless, and the parents have an open dependency case in San Diego (the twins). Section 300, subdivision (g) allegation states "[t]he exact whereabouts of [F]ather is unknown, and he is unable to provide care and support to his child." The Department later filed an amended petition, which repeated these allegations and also added a (g) allegation as to Mother because her whereabouts had become unknown. Mother was later located incarcerated in June 2023.

The juvenile court held a detention hearing on December 7, 2022. Mother and Father were not present, but counsel was conditionally appointed for them. The court detained P.C. from both parents, ordered supervised Visitation, and authorized a paternity test.

About two weeks later, the Department filed a "Declaration of Due Diligence" concerning their efforts to find Father. The social worker outlined a number of sources the Department searched to find Father, including the databases of six Southern California state jails, the California Department of Corrections, and the "Federal Department of Prisons," all of which stated that Father was "Not Incarcerated."

6

In January 2023, the juvenile court found that "the Department has made reasonable efforts to contact and locate and notify" Father and Mother, but Father could not be found. The court therefore relieved Father's attorney.

At a jurisdiction hearing in February 2023, the juvenile court sustained the first amended petition's allegations. In doing so, the court found that the Department had given the parents proper notice of the proceedings. The court also ordered the Department to assess the MGM and the twins' adoptive parents for placement of P.C.

The court held a disposition hearing in April 2023. The court denied reunification services to Mother under section 361.5, subdivision (b)(10), (b)(11), and (b)(13),[2] and denied them to Father under section 361.5, subdivision (a), subdivision (b)(1), and (b)(11).[3] The court then ordered P.C. placed with the MGM and set the matter for a section 366.26 hearing. In doing so, the court found that "the Department has exercised due diligence in attempting to locate" Father and any unknown fathers and authorized notice of the section 366.26 hearing by publication.

---

[2] Section 361.5, subdivision (b)(10) allows the juvenile court to bypass reunification services to a child for a parent if a court has terminated reunification services for the child's sibling and the parent has not "made a reasonable effort to treat the problems" that led to the sibling's removal. Subdivision (b)(11) allows the same if the parent's parental rights have been terminated as to the sibling. And subdivision (b)(13) allows a bypass of services if the parent has "a history of extensive, abusive, and chronic use of drugs" and other circumstances apply.

[3] Section 361.5, subdivision (a) provides that an "alleged father" is not entitled to reunification services.

On June 6, 2023, the juvenile court held a hearing on P.C.'s counsel's ex parte motion concerning P.C.'s placement. Minor's counsel was concerned about P.C.'s placement because she had been removed from the MGM, who was unable to care for her, and placed into a foster home, but the Department planned to place her back with her previous foster family. Minor's counsel thus requested, among other things: "an order that minor not be moved from current placement; that alleged father [R.C.] be appointed counsel and order paternity testing forthwith; that the Department make efforts to notice relatives and conduct relative assessments of both maternal and paternal side, to include a reassessment of the minor's siblings' adoptive parents . . . ."

The court continued the hearing for a few weeks later. Later at the same hearing, however, minor's counsel reported that Father had contacted her from federal prison. The court therefore reappointed counsel for Father, who confirmed that Father was in federal custody and had contacted the Juvenile Defense Panel office the day before. The Department had also spoken with Father on June 3, 2023.

In late June 2023, P.C.'s attorney contacted the Department and reported that Father had contacted her. Counsel reported that Father was incarcerated "in San Diego at the Otay Mesa facility," where he had been incarcerated since March 2022. Counsel "checked online and it appears he is a federal inmate." Counsel also told the Department that Father gave her "numbers to various paternal relatives who also may be interested in placement if paternity is established," so she would be seeking paternity testing.

On June 20, 2023, a Department social worker spoke with Father on the phone. He reported that the MGM had called him about a month prior seeking information on who could take care of P.C. On that call, he learned for the first time that the twins had been adopted. He explained that he wanted custody of P.C., but he would not be released from prison until May 2024 and could not participate in services where he was, although he would be moving to a different facility that allowed services.

On June 26, 2023, Father filed a section 388 petition requesting that the court vacate its jurisdictional findings and hold another jurisdictional hearing and, if jurisdiction is still established, hold another dispositional hearing. The petition explained that "[i]n early June 2023, [F]ather called minor's counsel from his place of incarceration and indicated that he had spoken with the MGM," and argued that "[i]t's apparent with any effort to follow up with the [M]other or MGM, the [F]ather could have been located early on in this case." The petition continued: "Father should have been located early on. The paternal relatives have been located and they have given input on what's in the child's best interests, their voice should have been heard much earlier in this matter. What action did the [Department] utilize except for checking the federal inmate locator website, wherein, it show[s] [F]ather's inmate registration number." The juvenile court set a hearing on the petition for August 2023 but continued it to September.

In September 2023, the Department submitted a report for the approaching section 366.26 hearing. The Department recommended that the court terminate the parents' parental rights to P.C. and free her for adoption by her current foster family. The

Department reported, however, that in July 2023, the paternal aunt "expressed interest to the Department in having [P.C.] placed in her care." The Department referred the issue for "Resource Family Approval" on August 8, 2023, "to have [the] paternal aunt assessed for placement," but the results were still pending.

The juvenile court revisited P.C.'s counsel's motion concerning placement on June 26, 2023. After hearing from the parties, the court ordered that P.C. remain in her current foster home and ordered paternity testing at Father's counsel's request.

Father's counsel explained the apparent confusion over Father's whereabouts. Counsel noted that the Department's "due diligence search" indicated that they did a "search for BOP, which is Bureau of Prison, which encompasses the federal inmates. He wasn't shown to be in custody, but there is a registration number. I confirmed that he's in a private facility, that BOP cont[r]act with Otay Mesa."

At the September 15, 2023, hearing on Father's section 388 petition, Father's counsel explained that Father's "relatives have been very helpful" and "have communicated with" counsel, but everyone was "frustrat[ed] because we don't have the DNA test." Counsel argued that Father's petition should be granted because the Department had Father's federal inmate registration number, but did not sufficiently follow up. In counsel's view, "[r]elatives should have been located. The [MGM] knew what was going on. She knew the paternal relatives. So dad has been left out the picture. It all could have been resolved early on." Counsel then noted that "they are assessing the paternal aunt, as well, for potential placement, the backup so to speak."

10

Minor's counsel, who opposed the petition, disputed that the MGM knew of Father's whereabouts. Counsel explained that Father had contacted MGM, who provided Father with counsel's number "so that he could be involved in these proceedings."

The juvenile court denied Father's petition after a hearing on it. The court found that there was "no due process violation" under *In re Justice P.* (2004) 123 Cal.App.4th 181 (*Justice P.*), because the Department made a "good faith attempt" to locate Father and provide him notice. The court reasoned that although the information the Department relied on "may not have been accurate. . . we have proceeded," and "our goal is to ensure that this child, her best interests are met, and that she is ultimately provided permanency." The court found that P.C. was "in a stable home by all indications" and was "bonding with the current caretakers," but "more importantly," Father was not due to be released until late May 2024 (eight months later), "which exceeds the six-month reunification timeline to begin with."

Father's counsel then reiterated that "there are a number of paternal relatives that are interested" and that "[t]hey want to keep this child within the family." Counsel continued: "They are assessing the paternal aunt. She has been here [in court] -- this is her second or third time. So there's interest in keeping this child in the paternal side of the family should the DNA testing prove that he's the father." The court replied, "Understood. But I want to be clear that the child is not to be moved without further Court order," and the hearing concluded shortly after.

11

In November 2023, five months after the court authorized paternity testing, the Department received results confirming that Father is P.C.'s biological father. Father's counsel immediately filed a second section 388 petition challenging the juvenile court's jurisdictional findings and dispositional orders. The petition asked the court to provide Father with reunification services for six months, "and if his relatives approved for placement, order the minor be placed with his relatives." The petition asserted this would be in P.C.'s best interests in part because there were "late DNA test results, but [F]ather invested in reunification, and his relatives form a core support for him based on their contact with the minor, attending court hearing, and cooperating with the [Department]."[4]

The juvenile court summarily denied the petition without a hearing. The court found that "the request does not state new evidence or a change of circumstances" and "the proposed change of order [] does not promote the best interest of the child."

At the continued section 366.26 hearing about a week later, the juvenile court found Father to be P.C.'s biological father but continued the hearing because Father had not been transported.

In December 2023, Mother filed a section 388 petition seeking reunification services. Mother argued she should receive services because she had been released from prison, had tested negative for all substances, and was "enrolled in a residential treatment facility that is designed to support mothers reuniting with children." The court

---

[4] Around the same time, Mother filed a section 388 petition seeking reunification services as well. The court denied the petition, but Mother does not challenge that ruling on appeal.

summarily denied the petition without a hearing because "the request does not state new evidence or a change of circumstances" and "the proposed change of order [] does not promote the best interest of the child."

The juvenile court eventually held a section 366.26 hearing in January 2024. Father and Mother appeared telephonically, but Father's counsel asked for another continuance so Father could be there. The juvenile court denied the request and also refused to allow Father to make a statement. Father's counsel opposed terminating parental rights and asked for guardianship as a permanent plan instead. Counsel "note[d] that we asked for a relative placement" and "asked for assessments," and that Father wanted P.C. "placed with his family," but there was no "update regarding relative placement." Counsel reiterated Father's position that the Department's due diligence in trying to locate Father at the beginning of the case was lacking because "[w]hen you have a registration number for a federal inmate, [the Department] could have contacted federal probation to locate" Father.

The juvenile court rejected Father's counsel's arguments. The court first found that "notice of the hearing was proper," there was no "legal basis to further delay this process," and that the court "need[ed] to proceed with permanency" for P.C. The court then found that P.C. was likely to be adopted, terminated parental rights, and freed her for adoption by her current foster parents. The parents timely appealed.

13

DISCUSSION

The parents argue the juvenile court erroneously denied their section 388 petitions and, in turn, erroneously terminated their parental rights.[5] As to Mother's petition, we find no error, but we conclude the court prejudicially erred by denying Father's petitions and that this error prejudicially affected the section 366.26 proceedings. We therefore reverse the juvenile court's orders denying Father's section 388 petitions, vacate the order terminating parental rights, and remand for further proceedings consistent with this opinion.

A. *Mother's Section 388 Petition*

Section 388 authorizes a parent of a dependent child to petition for a hearing to change, modify, or set aside any previous court order. (§ 388, subd. (a)(1).) For a petition to be granted, the parent must make a prima facie showing of "new evidence" or a "change of circumstances and that modification of the prior order would be in the best interests of the minor child." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

"To make a prima facie showing under section 388, the allegations of the petition must be specific regarding the evidence to be presented and must not be conclusory." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) "'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the

_____

[5] Father makes a number of arguments on appeal, but his overarching argument is the juvenile court erroneously denied his section 388 petitions. We discuss and resolve only the arguments and issues necessary to resolve this appeal.

14

allegations by the petitioner is credited.' [Citation.] 'Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the [dependency] court's own file . . . .' [Citation.]" (*In re B.C.* (2011) 192 Cal.App.4th 129, 141.) Thus, when deciding whether the parent has made a prima facie showing, "the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

We review the juvenile court's decision to deny a section 388 petition without an evidentiary hearing for an abuse of discretion. (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 62.) The juvenile court's decision will not be disturbed unless the court "'"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'"' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

There was no abuse of discretion here because Mother failed to make a prima facie showing of changed circumstances. (See *In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 478.) "'Not every change in circumstance can justify modification of a prior order.' [Citation.] The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120-121.) The change of circumstances "'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' [Citation.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

15

P.C. was removed from Mother's care in large part because of her years-long, chronic drug use, which persisted through her pregnancy with P.C. up until she was born. She and P.C. both tested positive for drugs when P.C. was born, and Mother admitted that she had been using drugs since she was 15 (or about 18 years).

Mother's section 388 petition argued that her circumstances had changed because she was "testing negative for all substances" and was in a residential treatment facility. It is unclear how long she had maintained her sobriety, but the record suggests it was at best six months (from her June 2023 arrest until she filed her petition in December 2023). It was also questionable whether Mother would maintain her sobriety given that she had consistently used for nearly 20 years and had successfully completed in substance abuse programs in the past, although the most recent one was in 2018.

This brief period of alleged sobriety and Mother's efforts to overcome her drug issues, though commendable, are not enough to show changed circumstances. "[A] showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.*, *supra*, 68 Cal.App.5th at pp. 120-121.) This is because "[i]t is the nature of addiction that one must be 'clean' for a much longer period . . . to show real reform." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9; see also *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [three months of sobriety insufficient to show changed circumstances].) At best, Mother's circumstances were changing, not changed. (See *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223.)

Given Mother's persistent drug issues, the juvenile court could reasonably find that she failed to make a prima facie showing that her circumstances had changed. For this reason alone, the court did not abuse its discretion in denying her section 388 petitions without holding an evidentiary hearing. (See *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

B. *Father's First Section 388 Petition*

Father filed his first section 388 petition seeking a new jurisdictional hearing in July 2023, shortly after he learned of the proceedings. Relying on *Justice P.*, *supra*, 123 Cal.App.4th 181, the juvenile court denied the petition because (1) the Department had made a "good faith attempt" to locate and notice Father of the proceedings and (2) it was not in P.C.'s best interests to revisit jurisdiction. We conclude the record does not support the court's first finding. Although *Justice P.* supports its second finding, we disagree with *Justice P.*

A parent may challenge jurisdictional findings for lack of notice through a section 388 petition. (*In re R.A.* (2021) 61 Cal.App.5th 826, 836.) Alleged fathers, like Father before the paternity results, have a due process right to notice of dependency proceedings, including jurisdictional hearings. (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1408.) When a parent's whereabouts are unknown, a social services agency like the Department must conduct a "good faith," "thorough and systematic investigation" to try to locate a parent in order to give them notice of the proceedings. (*In re J.R.* (2022) 82 Cal.App.5th 569, 572.) This includes "'standard avenues'" to locate the parent, as well

17

as "'"specific ones . . . under the unique facts"'" of the case. (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 712.) In other words, social service agencies like the Department must "'make every reasonable effort'" and "'must leave no stone unturned'" to notify a parent of the dependency proceedings. (*Id*. at p. 711.)

That did not occur here. In its probable cause statement, the Department social worker stated "the mother reported the father is currently in state prison in San Diego County; however, when I searched for the father, I only discovered one match," which "included a middle name without a date of birth," but the social worker could not "confirm with the mother the father's full name or get any additional information." There is no indication the Department ever followed up on this "one match" nor is there any explanation for why it did not do so.

Despite this apparent match for Father in San Diego State Prison, the Department's Declaration of Due Diligence states that Father was "Not Incarcerated" in San Diego County jail. The declaration also states that the Department searched the online system of the "Federal Department of Prisons,"[6] which indicated only that Father was "Not Incarcerated." But, in support of Father's section 388 petition, filed in July 2023, his counsel submitted correspondence from minor's counsel to the Department from the month before stating that she "checked online and it appears [Father] is a federal inmate." Father also submitted a July 2023 printout from the BOP's "Find An Inmate"

---

[6] We assume the Department meant the federal Bureau of Prisons since the federal "Department of Prisons" does not exist.

18

online database, which states Father is "Not in BOP custody," which could explain why the Department thought Father was "Not Incarcerated." As Father's counsel explained at the hearing on the petition, the confusion over Father's whereabouts arose because Father was in a private facility that contracted with BOP, so he technically was "Not in BOP custody." But the BOP printout shows that, as of July 2023, Father had a "Registration Number" and a release date in May 2024, which reasonably suggested that he was still incarcerated *somewhere*.[7]

At best, this evidence raised unanswered questions about the statement in the Department's due diligence declaration that Father was "Not Incarcerated" in federal prison. At worst, it showed that the statement was verifiably wrong and that two attorneys had found readily available information online that the Department missed or failed to explore. In either event, it strongly suggests that the Department failed to fulfill its duty of looking into every avenue of available information to locate Father.

The Department counters that nothing in the record shows that this evidence was available in December 2022, when the Department filed its due diligence declaration. But that unreasonably places the burden on Father to prove a negative (i.e., that

---

[7] We note that federal criminal filings are publicly available online as soon as they are filed (unless they are sealed). Given Mother's statement that Father was in federal prison in San Diego but apparently not showing up on the BOP database, the Department could have reviewed the filings, which would have had the contact information of the federal prosecutors and Father's defense attorney, if any, who almost certainly would have had helpful information about whether and where Father was incarcerated. However, we do not fault the Department for failing to do so here, particularly given that Father does not raise the issue.

19

information about him was not available on the federal inmate database when the Department looked in December 2022). Regardless, Mother reported in the days after P.C.'s birth that Father was incarcerated in federal prison in San Diego and, shortly thereafter, a Department social worker found "one match" for him on a San Diego County state prison database. In a detention report filed days later, a Department social worker noted that records from the parents' San Diego dependency case indicated that Father might not be P.C.'s father because "the timeline of his arrest" did not align with P.C.'s birthdate, meaning he may have been in custody when P.C. was conceived. A "thorough, systematic" review based on this information that "leaves no stone unturned" would reasonably *confirm* whether and where Father was charged and if he remained was in custody.

The juvenile court, however, found that under *Justice P.* "there is no due process violation when there has been a good faith attempt to locate or provide notice." As *Justice P.* confirms, however, that proposition applies only when the parent is "transient" and their "whereabouts are unknown for the majority of the proceedings." (*Justice P.*, *supra*, 123 Cal.App.4th at p. 188.) Otherwise, the social service agency must conduct "a thorough, systematic investigation *and* an inquiry . . . in good faith." (*Ibid.*, italics added.)

True, Father's whereabouts were unknown to everyone between December 2022 and early June 2023. But he was incarcerated—not transient—and the Department failed to exhaust all reasonable avenues to confirm whether and where he was incarcerated,

even though Mother reported when P.C. was born that Father was in federal custody in San Diego and two attorneys found him through the BOP's online database (albeit more than six months later).  Under these circumstances, the Department was required to do more than what the juvenile court found was a "good faith attempt to locate or provide notice."  The Department instead had to conduct a "thorough, systematic" investigation that left "no stone unturned."  It failed to do so, although we do not question that the Department's efforts were a sincere, good faith attempt to find Father.

*Justice P.* is distinguishable for several other reasons.  This case is unlike *In re Melinda J.* (1991) 234 Cal.App.3d 1413, the main case *Justice P.* relied on when holding "there is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings."  (*Justice P.*, *supra*, 123 Cal.App.4th at p. 188.)  There, the social services agency did everything it possibly could have to locate a homeless mother, but was unsuccessful.  (*In re Melinda J.*, *supra*, at p. 1418.)  "[E]ven with the benefit of hindsight," the Court of Appeal saw "nothing else that should have been done."  (*Id.* at p. 1419.)  Here, however, the Department could have done more to find Father.

The *Justice P.* court also declined to find whether the social services agency violated the father's due process right to notice of dependency proceedings concerning his children.  (*Justice P.*, *supra*, 123 Cal.App.4th at p. 189.)  The agency made various unsuccessful attempts to locate the father before learning that he was in jail.  (*Ibid*.)  Then, the agency "effectively abandoned" its search for the father for five months, after

21

which it properly noticed him of the dependency proceedings. (*Ibid.*) The father then filed a section 388 petition, which the juvenile court denied without an evidentiary hearing. (*Justice P.*, *supra*, at p. 187.) The *Justice P.* court assumed without deciding that the evidence of what the agency did or did not do to find the father was "new evidence sufficient to satisfy the first prong under section 388," and found the juvenile court properly denied the father's section 388 petition because he failed to show granting it was in the children's best interests. (*Justice P.*, *supra*, at p. 189.)

The *Justice P.* court thus did not decide whether the agency fulfilled its duty of searching for the father. The court instead only "expressed [its] disapproval" of the agency's "inexcusable" five-month delay in noticing the father of the proceedings while he was in jail, found that the juvenile court properly denied the father's section 388 petition on best-interests grounds, and then concluded any notice error was harmless beyond a reasonable doubt (for reasons we discuss more below). (*Justice P.*, *supra*, 123 Cal.App.4th at pp. 189, 192-193.)

That leads us to express our disagreement with *Justice P.* As another court explained: "The *Justice P.* court reasoned that removing discretion to deny a section 388 hearing based on best interests 'would be antithetical to not only the section 388 petition process but also to the current dependency system as a whole.' [Citation.] Such an approach ignores the key role of the child services agency entrusted with searching for a child's parents. 'We cannot accept the idea that an agency may completely ignore its duty to search for a missing parent and then, should the missing parent show up, rely on

22

the best interest of the child to preclude that parent from participating in the dependency case.' [Citation.] Allowing a child's best interests to act as a counterbalance to the agency's due diligence obligations would turn one of the key goals of the dependency statutory scheme on its head, reducing the chance of family reunification while simultaneously rewarding inadequate efforts to notify parents." (*In re Mia M.*, *supra*, 75 Cal.App.5th at p. 811; see also *In re R.A.*, *supra*, 61 Cal.App.5th at p. 836 [holding the best interest prong of section 388 does not apply "'when a parent shows he did not receive notice of the dependency petition in violation of due process'"]; *In re Daniel F.*, *supra*, 64 Cal.App.5th at p. 716 [same].)

We agree in full and therefore decline to follow *Justice P.* here, as the Department urges us to do. For that reason, we conclude the juvenile court erred in denying Father's section 388 petition challenging the court's jurisdictional findings in part because it was not in P.C.'s best interests.

In short, we conclude the juvenile court incorrectly found that the Department exercised reasonable diligence in trying to locate Father and notice him of the dependency proceedings. As a result, Father's due process rights to notice were violated. The juvenile court compounded this error by finding that revisiting jurisdiction after Father had been located and appeared in the case was not in P.C.'s best interests. The juvenile court therefore erred in denying Father's section 388 petition.

We review this error under the beyond-a-reasonable-doubt standard. (*Justice P.*, *supra*, 123 Cal.App.4th at p. 193.) On this record, we cannot find the error harmless beyond a reasonable doubt.

The Department argues any error in not giving notice of the proceedings to Father was harmless with regard to jurisdiction because the juvenile court would have had jurisdiction even if Father had been properly noticed since he was incarcerated long before and after. The Department argues the error was likewise harmless as to disposition because, as the juvenile court found, Father was entitled to a maximum of six months of reunification services and he was incarcerated long past that reunification period.

The Department overlooks a critical aspect of Father's section 388 petition and arguments on appeal. At the hearing, Father's counsel explained that Father and his relatives, in particular his sister (the maternal aunt), were interested in caring for P.C. and "keeping [her] in the family" if the then-pending DNA test proved she is Father's child, so the Department was "assessing" the paternal aunt for placement at the time. The Department was "*required* to assess those relatives seeking placement according to the factors described in section 361.3, subdivision (a) (placement factors)[] and must document those efforts in the social study prepared under section 358.1." (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719, fn. omitted.)[8] But, for reasons not explained in the

_____

[8] Minor's counsel made this point at the disposition hearing in April 2023, but with regard to maternal relatives.

24

record, that assessment was not completed before the January 2024 section 366.26 hearing, and the DNA testing was not completed until November 2023 (five months after the court authorized it) because Father was incarcerated.

Had the Department exercised reasonable diligence in December 2022, when this case began, then they likely would have found Father up to six months earlier than they did. That could have had two significant, interrelated effects. First, Father's paternity presumably would have been established far earlier in the case. Second, the Department and juvenile court would have been required to consider placing P.C. with the paternal relatives as the first placement before considering non-relatives. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 320; § 361.3, subd. (c)(1); Fam. Code, § 7950 [placement shall, if possible, be made in the home of a relative, unless the placement would not be in the best interest of the child].) Because the paternal aunt showed interest in "keeping [P.C.] in the family" when "the paternal family became aware of [P.C.]," subject to a DNA test proving P.C. is Father's daughter (as it later did), it is reasonably likely that the juvenile court would have viewed placement differently much earlier in the case, possibly just after P.C. was detained. Placement and legal guardianship with the paternal aunt would have been a better outcome for Father, regardless of whether the court retained jurisdiction over P.C. and denied Father reunification services. (*In re Mia M.*, *supra*, 75 Cal.App.5th at p. 814.) As a result, we cannot say that the Department's failure to conduct a reasonably diligent search to find Father was harmless beyond a reasonable doubt.

In summary, (1) the Department did not conduct a reasonably diligent search to locate Father, (2) the juvenile court erroneously found that the Department satisfied its duty to find Father and give him notice of the dependency proceedings based on its finding that the Department made a "good faith attempt" to find Father and its improper reliance on P.C.'s best interest (see *In re Mia M.*, *supra*, 75 Cal.App.5th at p. 811), (3) Father's due process rights were accordingly violated, and (4) on this record, the error is not harmless beyond a reasonable doubt.  The court therefore erred in denying Father's first section 388 petition.  (See *Mia M.*, *supra*, at p. 814.)

C.  *Father's Second Section 388 Petition*

Two days after receiving DNA results ordered five months prior that confirmed he is P.C.'s father, Father filed his second section 388 petition in November 2023.  The juvenile court summarily denied the petition without a hearing.  We conclude the court abused its discretion in doing so.  (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 62.)

Father's petition asked the juvenile court to order six months of reunification services for him "and if his relatives approved for placement, order the minor be placed with his relatives."  The Department "referred" paternal aunt's request to be assessed for placement over three months earlier, but the results remained pending when Father filed his second section 388 petition.  In fact, they remained pending two months later when the juvenile court held the section 366.26 hearing in January 2024.[9]

---

[9] In a November 2023 addendum to their section 366.26 report, the Department stated, "An assessment for placement has been submitted for paternal aunt.  The assessment has not been approved."  We understand this to mean that the assessment had

*[footnote continued on next page]*

We do not know why the paternal aunt was never assessed for placement. According to the Department's section 366.26 report, "[o]nce the paternal family became aware of [P.C.] . . . [the] paternal aunt expressed interest . . . in having [P.C.] place in her care."  The paternal aunt was consistently involved with the case.  She communicated with the Department and Father's attorney and gave her input on what she thought was best for P.C., which Father's attorney found "very helpful,"; she appeared at multiple hearings and received notice of proceedings; and she started consistently visiting P.C. every month in August 2023, and eventually asked for more visits.  Although the information in the record about the paternal aunt's relationship with P.C. and her involvement with this case is limited, all of it appears to be positive.  Father's second section 388 petition thus presented new evidence confirming that he is P.C.'s biological father and his sister, the paternal aunt, wanted to be considered for placement.

The intent of the Legislature is "that relatives be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child."  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 320.)  This intent is reflected in section 361.3, which  "gives 'preferential consideration' to a relative request for placement, which means 'that the relative seeking placement shall be the first placement to be considered and investigated.'"  (*Cesar V. v. Superior Court* (2001) 91

not *yet* been completed given that the Department never suggested below or on appeal that the assessment had been completed and the paternal aunt's request for placement was denied.  The Department said nothing about it when Father said at the section 366.26 hearing that the results of the assessment remained outstanding.  In their respondent's brief, the Department argues only that, as of the time Father filed his second section 388 petition, "the relatives were *not yet* approved."  (Italics added.)

27

Cal.App.4th 1023, 1033.) This obligation persists even "after the reunification period where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 594-595.)

In making that assessment, the social services agency and juvenile court are required to consider the factors described in section 361.3, subdivision (a), and any other factors the juvenile court may deem relevant to the child's particular circumstances, the most important factor being "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs." (§ 361.3, subd. (a)(1).) "However, in determining whether the child should be placed with the relative, the juvenile court should not substitute the generalized best interest showing required under section 388 for its independent assessment of the relevant statutory criteria under section 361.3." (*In re Isabella G.*, *supra*, 246 Cal.App.4th at p. 722, fn.11.)

Nothing in the record suggests that the Department or the juvenile court sufficiently considered placing P.C. with the paternal aunt under section 361.3, as they were required to do. Again, as of the section January 2024 section 366.26 hearing, the paternal aunt's request to be assessed for placement made at least six months earlier inexplicably remained pending. The juvenile court never discussed the issue of relative placement, even after Father's counsel expressly raised it in his second section 388 petition and again at the section 366.26 hearing.

When assessing a section 388 petition, courts should "consider the entire factual and procedural history of the case" when relevant. (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 62.) Father and his relatives were not notified of the dependency proceedings for over six months—nearly halfway through—because the Department failed to locate him while he was in custody. DNA testing could not be done for another five months, apparently because of federal prison bureaucracy. In other words, neither delay was Father's fault. But by that point, the juvenile court had already set a section 366.26 hearing even though neither the court nor the Department had satisfied their statutory mandate to "favorably" assess and consider relative placement. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 320.)

Given the Department's failure to diligently search for Father, the lengthy delay in DNA testing due to his incarceration, the Department's failure to timely assess the paternal aunt for placement in the four months between her request for assessment and Father's second section 388 petition, we conclude that, at a minimum, the juvenile court should have held an evidentiary hearing on the petition to consider relative placement. The juvenile court's failure to do so was prejudicial under any standard because Father was entitled to a fair hearing on whether P.C. should be placed with the paternal aunt. (See *In re Isabella G.*, *supra*, 246 Cal.App.4th at p. 724; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 433.) We therefore reverse the juvenile court's order denying Father's second 388 petition.

D. *Remand*

For the foregoing reasons, we conclude the juvenile court properly denied Mother's section 388 petition but erroneously denied Father's section 388 petitions. We therefore affirm all of the juvenile court's orders as to Mother but reverse the court's orders denying Father's section 388 petitions. As a result, we vacate the order terminating his parental rights to P.C. and freeing her for adoption by her current caregivers and remand for a new jurisdiction and disposition hearing as to Father only. At that hearing, the juvenile court may consider "facts and circumstances that have arisen since the filing of this appeal." (*In re Mia M.*, *supra*, 75 Cal.App.5th at p. 814.)

IV.

DISPOSITION

The juvenile court's orders terminating parental rights is vacated as to Father and affirmed as to Mother. The court's orders denying Father's section 388 petitions are reversed, and the matter is remanded for a new jurisdiction and disposition hearing involving Father only.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

30